J.D.D. v A.D. (2024 NY Slip Op 50111(U))

[*1]

J.D.D. v A.D.

2024 NY Slip Op 50111(U)

Decided on January 31, 2024

Supreme Court, Westchester County

Hyer, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 31, 2024
Supreme Court, Westchester County

J.D.D., Plaintiff,

against
A.D., Defendant.

Index No. 59946/2021

James L. Hyer, J.

Basic Background & Procedural History
The parties married on October 8, 1995, in Greenbelt, Prince George's County, Maryland, in a religious ceremony. Together, they have three children: (1) Z.D. (born XX/XX/1998); (2) E.D. (born XX/XX/2005); (3) L.D. (born XX/XX/2007) (hereinafter referred to as the "Children"). No further children of the marriage are expected.
Plaintiff commenced this matrimonial action on July 23, 2021, with the filing of a Summons, Complaint, and ancillary documents. The Complaint requested, inter alia, the entry of a Judgment of Divorce to dissolve the parties' marriage pursuant to New York State Domestic Relations Law § 170(7) asserting that the parties' marriage had irretrievably broken down for a period in excess of six months.
On August 16, 2021, a Consent to Change Attorney was filed indicating that Plaintiff's then-attorney Garr Silpe, P.C., was to be replaced by incoming counsel Dimopoulos Bruggeman, P.C., who also filed a Notice of Appearance on that date.
On September 28, 2021, Defendant filed a Verified Answer and Counterclaim by her then-counsel Carton & Rosoff, P.C. The Answer requested, inter alia, the entry of a Judgment of Divorce to dissolve the parties' marriage pursuant to New York State Domestic Relations Law § 170(7), asserting that the parties' marriage had irretrievably broken down for a period in excess [*2]of six months.
Approximately five months after Plaintiff commenced this action, on December 13, 2021, Plaintiff's then-counsel filed a Request for Judicial Intervention seeking the scheduling of a Preliminary Conference.
On December 15, 2021, the Court uploaded a Court Notice to NYSCEF, directing a Preliminary Conference to be held on January 10, 2022, at 3:00 p.m. The Court held the Preliminary Conference on February 18, 2022.
On March 22, 2022, an Order Appointing Neutral Real Property Appraiser Contested Matrimonial was entered by the Hon. Thomas Quinones, J.S.C., appointing Jane Moss Appraisals to prepare an appraisal report at present value for the real property located at [redacted], Briarcliff Manor, New York 10510.
On May 13, 2022, the Court issued a Court Notice, scheduling a Trial Ready Conference for June 7, 2022, at 10:00 a.m.
On September 1, 2022, the Court entered a Preliminary Conference Order (Quinones, J.). This PC Order had been previously executed by Court Attorney Erin Guven on February 18, 2022. Section F of this Order provided (NYSCEF Doc. No. 17 at 7-8):
The parties stipulate as to pendente lite support and other interim issues as follows: The Plaintiff shall continue to maintain the financial status quo by funding with his salary the joint marital account at Bank of America (xx2559) to pay 100% of the reasonable and agreed upon marital expenses, e.g., mortgage, real estate taxes, insurance, maintenance, utilities, etc.; as well as the Defendant's reasonable and customary credit card charges for marital expenses of those of the children.
On September 1, 2022, the Court entered a Discovery Order (Quinones, J.), which directed that:
(1) ntiff shall comply with Defendant's discovery demands on or before October 17, 2022;
(2) y depositions shall be completed on or before November 30, 2022;
(3) ies shall appear for trial in this matter from 10:00 a.m. to 4:30 p.m. on April 17, 2023, April 28, 2023, and May 1, 2023;
(4) overy is not stayed even if the parties decide to proceed with mediation; and
(5) ies to appear in-person for a settlement conference on September 20, 2022 from 2:00 p.m. to 4:00 p.m.
On November 8, 2022, a Consent to Change Attorney was filed wherein Garr Silpe, P.C., was noticed as Plaintiff's incoming counsel, replacing Dimopoulos Bruggemann, P.C. And on December 26, 2022, a Consent to Change Attorney was filed wherein A.D. indicated she would be proceeding as a self-represented litigant, replacing Carton & Rosoff, P.C.
On January 25, 2023, the Court (Quinones, J.) entered a Trial Scheduling Order, which directed Plaintiff to file a Note of Issue on or before March 27, 2023, and the trial will be held from 10:00 a.m. to 4:30 p.m. on April 27, 2023; April 28, 2023; and May 1, 2023.
On February 7, 2023, Plaintiff filed a Verified Reply to Counterclaim, and the Note of Issue and Certificate of Readiness for Trial.
On March 17, 2023, the Court issued a Court Notice, advising that this matter had been transferred to the undersigned the Hon. James L. Hyer, J.S.C. The Court stated that the matter was advanced to March 24, 2023 at 2:00 p.m. for a Settlement Conference.
On March 22, 2023, The Wiederkehr Law Group, P.C. requested an adjournment of the scheduled Settlement Conference, advising the Court that it may be retained as Defendant's counsel. The Court denied the adjournment request absent the filing of a Notice of Appearance by counsel.
On March 23, 2023, The Wiederkehr Law Group, P.C. filed a Notice of Appearance as Defendant's incoming counsel, along with a second request for an adjournment of the scheduled Settlement Conference. The Court granted the adjournment and scheduled the Settlement Conference for April 14, 2023, at 2:00 p.m.
On May 8, 2023, the Court held the Settlement Conference. The Court entered an Order, directing a second Settlement Conference to be held on May 25, 2023, at 12:00 p.m.
On May 31, 2023, the Court held the second Settlement Conference and entered an Order, directing a third Settlement Conference to be held on June 23, 2023, at 12:00 p.m.
On June 23, 2023, the Court held the third Settlement Conference. The parties placed the terms of a partial settlement on the record. The Court allocuted the parties, regarding: (1) equitable distribution pertaining to the parties' vehicles; (2) equitable distribution pertaining to an insurance payment; (3) equitable distribution pertaining to all other tangible personal property; (4) equitable distribution as to retirement accounts; (5) equitable distribution as to the marital domicile; (6) equitable distribution as to financial accounts; and (7) equitable distribution as to the Children's accounts.
On June 26, 2023, the Court entered an Order, directing the parties order the June 23, 2023 transcript, share the cost equally, and submit it to "so ordered." This Order further directed a fourth Settlement Conference to be held on June 28, 2023, at 2:30 p.m.
The Court entered a Pre-Trial Conference Order on June 30, 2023, which directed a Pre-Trial Conference to be held on October 4, 2023, at 9:00 a.m. and the Trial to commence on October 5, 2023, at 9:00 a.m.
On July 17, 2023, the Court so-ordered the transcript from the June 23, 2023 Settlement [*3]Conference. On September 19, 2023, Defendant's counsel filed a request for a Pre-Motion Conference, requesting a second Appraisal Report to be prepared for the parties' marital domicile. The Court scheduled the Pre-Motion Conference for September 22, 2023, at 9:00 a.m.
After the September 22, 2023 Pre-Motion Conference was held, the Court (Hyer, J.) entered a Decision and Order, which directed:
(1) Defendant's application is denied entirely;
(2) The parties shall comply with all Decisions and Orders entered by this Court in this action;
(3) Applications for attorneys' fees and costs are reserved for trial; and
(4) Defendant to order the Transcript of the Pre-Motion Conference, pay the cost for same and submit to the Court to be "so ordered" by September 29, 2023.
On September 22, 2023, Plaintiff's counsel filed this Decision and Order with Notice of Entry. Then, the Court "so ordered" a Stipulation on September 29, 2023, pertaining to the fair market value of an apartment located in the State of Florida.
The Court "so ordered" the September 22, 2023 transcript of the Pre-Motion Conference on October 2, 2023, and on October 4, 2023, the Court held the Pre-Trial Conference where a second partial settlement was placed on the record. The Court entered an Order, directing that a transcript be ordered and submitted to be "so ordered" by October 31, 2023. In addition, at the Pre-Trial Conference, five Court Exhibits were marked for identification and filed:
(1) Court Exhibit No.1 - Stipulation of Facts;
(2) Court Exhibit #2 — Plaintiff's Witness List, listing as potential witnesses the parties and Richard V. Turner, Ph.D.;
(3) Court Exhibit #3 — Defendant's Trial Witness List, listing as potential witnesses the parties;
(4) Court Exhibit #4 — Defendant's Trial Exhibit List, listing as Defendant's Proposed Trial Exhibits A-II, and stipulating that all would be marked and admitted into evidence at trial on consent with the exception of N, O, T, U, V, W, X, Y, Z, AA, DD, EE, FF, GG, and HH; and
(5) Court Exhibit #5 — Plaintiff's Trial Exhibit List, listing as Plaintiff's Proposed Trial Exhibits 1-36, and stipulating that all would be marked and admitted into evidence at trial on consent with the exception of 9 and 14-36.
A Trial was held before the Hon. James L. Hyer, J.S.C., on October 5, 2023, at which the three remaining issues were addressed, being: (1) child support; (2) spousal support; and (3) Plaintiff's claim for credit for reducing the principal balance on the mortgage against the marital [*4]domicile.
At the end of trial, the Court entered an Order on October 11, 2023, directing: (1) Post Trial Submissions, limited to 25 pages in length (including exhibits) shall be submitted by October 31, 2023; and (2) Transcript shall be ordered, cost split 80% by Plaintiff and 20% by Defendant, and shall be submitted to the Court to be "so ordered" by October 31, 2023.
On October 27, 2023, the Court granted Defendant's counsel's request for an extension to file Post Trial Submissions and set a new date of November 3, 2023.
The Court then granted Defendant's counsel's November 3, 2023 request for an extension to file Post Trial Submissions and set the filing date as November 6, 2023. Both parties filed their Post Trial Submissions on November 6, 2023. 
Trial Testimony and Documents in Evidence
The Court held the trial on October 5, 2023. All parties and counsel appeared, and the following witnesses testified: (1) Plaintiff J.D.D.; (2) Defendant A.D.; and (3) Richard V. Turner, Ph.D.
a. Testimony of Richard V. Turner, Ph.D.
Direct Examination -
Dr. Turner is a vocational rehabilitation counselor and vocational consultant who works with Wexler Consulting Services and Turner Vocational Services LLC. He does contract work with the Social Security Administration. He began employment with Wexler in late 2019. He holds a Bachelor's Degree in Psychology from Kansas State University, a Master's Degree in Rehabilitation and Counselor Education from the University of Ohio, and a Doctor of Philosophy from Southern Illinois University Carbondale in Rehabilitation Counseling. He is a Certified Rehabilitation Counselor and holds the International Psychometric Evaluator Certification from the American Board of Vocational Experts.
He was retained to perform an employability analysis of Defendant, which looks at an individual's employment capacity or employment abilities and provides information about the type of work they can do, as well as an estimate of what their likely earning capacity is. To conduct an employability analysis, Dr. Turner reviews the documents provided and information that is publicly available online about an individual's work history and employment skills; conducts a vocational interview with the individual; performs labor market research to understand where the individual's skills and abilities may sit in the open labor market; and reviews statistical data or compensation data to inform his opinion.
Dr. Turner testified that he has previously testified as an expert in the field of a vocational consultant on approximately nine occasions, five of which were depositions, including testimony before the New York State National Labor Relations Board. He testified that his expert testimony was also provided in the State of Missouri and the Florida Division of Administrative Hearings. On these nine occasions, he testified that he was admitted, and never [*5]rejected, as an expert witness. Plaintiff's counsel requested that Dr. Turner be admitted as an expert in the field of vocational employability assessment.
Defendant's counsel then engaged in a voir dire examination of Dr. Turner. Dr. Turner testified that of the nine occasions he testified as an expert witness, five were depositions, three were trials, and one was an arbitration. His expert testimony in the State of New York was limited to testimony provided at the National Labor Relations Board, which was not a New York civil litigation. He has never testified in a New York State Supreme Court matrimonial matter or expressed an expert opinion in a judicial proceeding concerning New York State residents. Defendant's counsel asked that Dr. Turner not be admitted as an expert in vocational analysis.
Plaintiff's counsel then asked another series of questions pertaining to the voir dire. Dr. Turner testified that he has prepared approximately 200 vocational reports, of which approximately 100 have been submitted to various legal authorities and to his knowledge, none of these reports have been rejected. He testified that he has prepared vocational reports in jurisdictions other than New York State, and that he follows the same methodology for vocational assessments used in the report prepared for this matter. Dr. Turner follows a nationally accepted methodology, and he is not aware of differences in how one state considers an individual's employability as compared to another state. He testified that he follows the VRAM methodology, the vocational and rehabilitation assessment model, which assesses an individual's skills and abilities that have been gained through education, training, employment experience, sometimes volunteer experience or other things that they have done and compares that to what is available in their local labor market. He explained that he would then determine what types of jobs or employment would be available for someone. He testified that the VRAM criteria do not differ from state to state. According to Dr. Turner, it was his opinion that his report complied with all the requirements of an acceptable, appropriate, professional, reliable vocational assessment report.
Defendant's counsel then asked another series of questions pertaining to the voir dire. When asked how many of the approximately 200 vocational reports he prepared pertained to a divorce action, Dr. Turner testified that a majority had been, noting probably more than 80 to 85 percent. Dr. Turner's analysis included a contrast between the experience of a candidate against the local labor market, as well as the general skills and abilities needed to perform essential functions of certain roles. When asked if the analysis he performs includes an intent for the conclusion that the individual can obtain and would in fact get those jobs, he testified that generally the opinion is that an individual is a competitive candidate for a role, but they cannot guarantee that someone will get a job. 
Dr. Turner explained that multiple factors exist with respect to a job candidate seeking employment, including whether their skill set is competitive for that position. He evaluates the individual holistically — in that he takes into consideration as many of the factors that you can assess as possible. But he explained that an individual's candidacy for a role can vary greatly, and it can be subject to the individual making a hiring decision. He believes he is qualified to express an expert opinion with a degree of vocational expertise as to the income that should be attributed to someone based upon his analysis.
The Court then granted the application of Plaintiff's counsel to recognize Dr. Turner as an [*6]expert witness in the field of vocational analysis.
Continuing with his testimony, Dr. Turner stated he prepared a 23-page report for this litigation, which was identified as Plaintiff's Exhibit #13, marked for identification, and admitted into evidence on consent. Pages 20-23 of that report were his current curriculum vitae. He testified that Ms. Wexler's current curriculum vitae was also included, along with an appendix of a selection of jobs identified in Defendant's local labor market for which she is either a competitive candidate or for which she could develop the skills to become a competitive candidate, as well as a summary of documents he reviewed. When asked what his sources were for the information he obtained to prepare the report, Dr. Turner responded that he believed most of the documents were provided by Plaintiff's counsel's office and the background information form Defendant completed. He testified that he had contact with Defendant, including a two-hour Zoom vocational interview in December 2022 within which Defendant was cooperative and answered all questions presented. Dr. Turner believed he had sufficient information to perform a complete vocational assessment and that he was unaware of any information missing that would have permitted him to conduct a more thorough evaluation.
Dr. Turner testified that Appendix B of the report is a summary of Economic Research Institute (hereinafter referred to as "ERI") base salary data for the three job titles that had been listed — activities coordinator, activities director, and administrative assistant. ERI is a company that utilizes a tool through their salary assessment portal that uses aggregate salary data from private companies and government sources. Dr. Turner testified that ERI classifies that information based on the jobs' functions, rather than just the title alone because there is title ambiguity. He testified that this information is used to provide base salary estimates for the selected employment positions, stratifying based on experience level and spread across percentile ranges. Dr. Turner considers ERI a professionally reliable source of information used throughout his industry.
Dr. Turner identified the three jobs noted in the report. The Activities Coordinator position was identified based on the analysis of the actual functions of those jobs which is most commensurate with the function that Defendant currently works in or worked in at the time of the evaluation. He testified that the Activities Director position is the position Defendant identified during her interview as a goal occupation after developing additional experience, as well as market research he conducted regarding Defendant's potential capabilities to become a competitive candidate for that role. Dr. Turner explained that the Administrative Assistant position was identified in the report as a potential alternative position that was consistent with Defendant's skills and abilities but the long-term earning capacity in that position would not necessarily keep up with Defendant's goal of Activities Director.
He then testified how ERI stratifies based on experience level or years of experience, and it has been his experience using ERI and performing labor market research that the leveling system is generally the most accurate when describing broader ranges of experience categories. Level One is generally an entry level position in the subject title; Level Two generally represents an individual with three to five years of experience, or they understand and master the essential functions of a role; and Level Three is an individual with substantially more experience within a role.
Dr. Turner explained that Level One is a person with little or no experience and for that individual to cross the threshold to Level Two based on ERI criteria as well as his experience with ERI data set, there must be three to five years of experience in the field or when the person has a general autonomous understanding of the general functions of a specific type of work. Dr. Turner testified that the percentiles represent the spread of salary ranges that are generally found across employers within their data set for individuals being hired, or working, at those levels.
The Administrative Assistant position is usually more generalized within an office setting, providing administrative support for individuals, rather than targeted services for a specific executive as would an Executive Assistant. He testified that while this position was not rejected, it did not seem to be the most appropriate recommendation based up Defendant's express desire to remain in therapeutic recreation. Further, the earning capacity was not going to be substantially higher than her current job thereby making it not that reasonable for her to change jobs.
With respect to the Activities Coordinator position, Dr. Turner testified that in the context of therapeutic recreation, this position is often found within an assisted living facility or other rehabilitation facilities. This is generally an entry level position where the individual is facilitating the actual therapeutic recreation within the facility, which can include coordination and planning or programming. Regarding the Activities Director position, Dr. Turner explained that it is a position that would be the next step or higher progression above Activities Coordinator, as there is generally more administrative responsibilities, supervisory oversight, more planning, and may have financial responsibilities.
He testified that for the Activities Coordinator position, there is not necessarily a baseline required education. His labor market research performed and his experience with the role lead him to believe that some employers were seeking candidates with a high school diploma, while others sought candidates with general bachelor's degrees, and some even requiring degrees in therapeutic recreation. Dr. Turner explained that at the Activities Director level, there is a split between a desire for individuals that have specific degrees in therapeutic recreation with more sophisticated roles sometimes requesting a master's degree, while many others were satisfied with individuals holding degrees or general bachelor's degree. He testified that for candidates with a general bachelor's degree, employers commonly wanted candidates to have therapeutic recreation experience, having been employed in something like an Activities Coordinator role. Dr. Turner stated that some employers request certifications and a bachelor's degree in therapeutic recreation, which he could not recall the name of, but which comes up occasionally in more sophisticated roles.
Dr. Turner determined the roles of Activities Coordinator and Activities Director were appropriate for Defendant. The Activities Coordinator position is the closest match based upon ERI data to what Defendant was doing at the time of the interview in that she was facilitating therapeutic recreation programming at a senior living facility. He testified that at the time of her interview, Defendant had been employed in that position for approximately five months as he believed she was hired for that position in July 2022 and that if she remained in that position, at the time of her testimony, Defendant would have held that position for approximately 15-16 months. Dr. Turner stated that he was aware of Defendant's educational background, which [*7]included a Bachelor's Degree in Journalism from the University of Maryland.
He testified that Defendant would have to continue in her position as an Activities Coordinator for seven to eight years to reach Level Three on the Activities Coordinator chart in the report. He stated that there generally is a direct correlation between the level of experience an individual has and the level of their earnings. He testified that Defendant could be earning at the time of the report, after four to six months of diligent job search, with approximately six months of work experience and skills development, approximately sixty to sixty-five thousand dollars per year with benefits. He testified that assuming Defendant remained in her position of Activities Coordinator from the date of the report to the date of his testimony, Defendant would have gained the additional six months of work experience referenced within the report. He then testified that for Defendant to earn between sixty and sixty-five thousand dollars she would be required to do nothing further, but that additional certification would be helpful because she does not have a specific educational background in vocational. He testified that the additional training that would be most beneficial would be the ADC certification of the Activities Director certification which has a two-year work experience requirement in addition to the course work and an examination. He testified that for this ADC certification, a separate certifying body evaluates an individual's work experience, along with the individual's completion of their required training and an examination. 
Dr. Turner located potential jobs for Defendant on various websites in the salary range he believes she could achieve, being jobs with a description like the ones described within the functions of ERI, as well as his understanding of the activities director roles that require approximately one year of experience for an individual facilitation therapeutic recreation. He testified that Appendix C of his report was the labor market research done at the time of his report. He testified that for Defendant to be a candidate for higher salary positions noted in the report, the most important factor would be additional experience and continued work experience, while additional certifications and training also would assist in her candidacy.
After three to five years of full-time employment and earning certification in the field, Dr. Turner believed her earnings would be approximately $70-75,000.00 dollars per year with benefits.
Cross-Examination —
After being directed to Appendix B of his report, Dr. Turner testified about how the table was prepared pertaining to levels of experience. He stated that with respect to percentiles, he was unable to explicitly determine what percentile a certain employer is willing to offer, but that there is a range of compensation that certain employers in the field will offer. He further testified that he could not opine about which employers offer what salary within the range. Dr. Turner stated that he could only determine what salary an individual is likely to receive within the provided salary range based upon their employability profile, but that ultimately, the employer decides what compensation to offer for a particular job.
Dr. Turner explained that utilizing his report, if Defendant remained in the same position for seven or more years and did well, her expected salary range would include the sum of $55,929.00 per year. He then testified that in a new role of Activities Director, within six [*8]months from the date of Dr. Turner's testimony, Defendant could be making $60-65,000.00 per year. According to his data, Dr. Turner opined that no matter how long she remained in her current Activities Coordinator position and regardless of her performance, Defendant was not likely expected to earn in that range of salary.
When questioned as to the ADC Training, Dr. Turner stated that to obtain certification, an individual must have two years' work experience, complete an exam, and engage in training which is offered in several different formats including in-person and self-study. He believed that individuals have one year to complete the training and that it can be completed within 12 to 24 weeks. Dr. Turner testified that if he was Defendant's career advisor, he would not advise her to secure ADC certification before starting a job search, as it would not be as appropriate as Activities Professional Certified (hereinafter referred to as "APC"). He testified that this is a lower-level certification that does not have experience requirements, and it is what Defendant qualifies for now.
Dr. Turner explained that the term "competitive candidate" means an individual who would be competitive for a certain type of role. He then defined "competitive" as an individual that has a likelihood of being selected within a role, or at least offered an interview based upon their qualifications. He testified that there is a big difference between being given an interview and being given a job. Dr. Turner stated that Defendant's age of 55 years old is absolutely a consideration in the literature which makes clear that older women in the workforce, especially those with less work experience, generally require a longer time to search for work. 
Defendant graduated with a journalism degree the late 1990s, and that an individual having a bachelor's degree is relevant in a job search. Dr. Turner relied upon Defendant's self-reported employment history as part of his expert analysis, including jobs that she had 25 to 32 years ago. He testified that these positions have less bearing which is why they were summarized succinctly. He testified that from 2013 to 2020, Defendant had several jobs, including working in a children's gym as an administrator, and teaching a weekly class among other administrative responsibilities.
When asked about the purpose of annexing job postings to his report, he testified that they are a selection of postings for which Defendant was a competitive candidate now or for which she could develop the necessary skills. Dr. Turner was unaware of who received the positions listed in those postings, what the successful candidates' qualifications were, how many candidates existed, who did the interviewing, or what the compensation offered was.
Re-Direct Examination —
When questioned about Defendant's resume (Plaintiff's Exhibit #14), Dr. Turner testified that Defendant described herself as operations manager/activities director during her employment at Fun Fit from March 2014 to October 2018. He stated that her resume lists responsibilities in this position, such as: (1) scheduled, coordinated and managed activities at the center, including parties, classes, camps, exercise programs, training sessions; (2) planned and coordinated monthly events for staff and Fun Fit members; (3) recruited, hired and trained staff members and instructors; (4) created multimedia training programs for staff; (5) designed, developed and managed the customer service request program which resulted in a 20% increase [*9]in event revenue; (6) developed marketing plan and program which included design of flyers, brochures and promotional materials which resulted in doubling the number of Fun Fit members; (7) created and instructed several classes including Broadway Tots, Line Dancing For Adults, Hula Hoop Hip Hop, Healthy Snacks for Kids and Cyber Safety for Your Fifth Grader; and (8) handled all customer service calls with a 100% satisfaction rating.
To Dr. Turner, these responsibilities were consistent with the activities of an Activities Director working in that type of establishment but acknowledged that it was part-time. He testified that for certain organizations that do not have certification requirements and lower experience requirements, Defendant would be an appropriate candidate for the Activities Director position. APC Certification stands for Activities Professional Certified and to obtain this, an individual must take a certified course or training program and pass a certification examination. Dr. Turner explained that it takes approximately nine weeks to complete the course with diligent efforts. 
Dr. Turner noted that during her interview, Defendant was affable, easy to speak with, and presented professionally. Regarding the job postings utilized in his report, Dr. Turner testified that they are only one piece of data that he utilized in reaching his conclusion, along with the vocational interview performed, resume and background, and Economic Research Institute data. He testified that the Economic Research Institute data generally provides the amount paid for jobs.
Dr. Turner believed his retainer was paid in full, that the amount of payment was not contingent upon the nature of his testimony, and that the amount of payment was consistent with his experience and the amount normally paid for these types of assignments.
Re-Cross Examination —
According to Dr. Turner, Defendant's employment at Fun Fit was for a number of hours that he could not recall. It was a hybrid position that permitted her to work from home and at the facility. He testified that he was unaware if Defendant was paid in this position.
b. Testimony of Plaintiff J.D.D.
Direct Examination -
Plaintiff married Defendant on October 8, 1995 in a civil ceremony, and the parties have three Children. Plaintiff is currently employed with STV, Inc., an engineering and construction management firm of approximately 2500 employees, as Director of Project Controls. He works in both locations in Westchester County and New York City. 
Plaintiff testified as to his Statement of Net Worth (Plaintiff's Exhibit #1), confirming having listed a monthly grocery expense of $339.00 for himself, Defendant and two of the parties' children who live with the parties. Plaintiff listed a monthly dining out and take out expense of $1,076.00 for the family and noted that the parties would dine a couple times per month at inexpensive places. Plaintiff testified that his monthly clothing expense was $178.00, which he would spend buying professional clothing from Costco, outlet malls, and Joseph A. [*10]Banks. Plaintiff has not shopped for suits in the last several years. Defendant shopped for clothing at Kohl's for herself and the Children. Defendant drives a 2007 Nissan Quest. Plaintiff drives a 1996 Cadillac DeVille inherited from his grandmother, and he has a 1975 Porsche that he purchased when he was in his twenties. Plaintiff performs all the landscaping and home repairs, and both parties clean the home.
Plaintiff testified that his yearly vacation expense of $1,400.00 was for vacations the parties would take on cruises, ski trips, and to a cooperative apartment in Fort Lauderdale that he inherited from his grandmother, and that this expense was for transportation to that apartment. Plaintiff's monthly expense of $54.00 was for Broadway shows a couple times per year which the parties obtained at reduced prices, and for movies. Plaintiff spends $10.00 per month on Planet Fitness, and he spends $122.00 per month on hair, beauty parlor, pedicures, and manicures. Plaintiff gets a haircut every six weeks at approximately $60.00 per visit. Plaintiff stated that Defendant infrequently gets manicures and pedicures, and she goes to the beauty salon two to three times per year sometimes at approximately $100.00 per visit.
Plaintiff testified that the parties' home was appraised for $1,550,000.00, and it is furnished with items the parties obtained new and used, as Plaintiff would restore items he obtained from the garbage. Plaintiff testified to several items of furniture in the parties' home which he restored and to other items located in the property. Plaintiff does not have expensive jewelry or watches, and that his wife's only expensive jewelry would be her engagement ring, two or three wedding bands, and a diamond bracelet.
Plaintiff testified that during the divorce action, he paid down the mortgage on the parties' home. As per the mortgage statement (Plaintiff's Exhibit 16), the unpaid balance as of August 10, 2023 was $771,906.33. Plaintiff testified that as per the mortgage statement (Plaintiff's Exhibit 17), the unpaid balance as of August 1, 2021 was $810,309.50. Thus, according to Plaintiff, the approximate total of the pay-down on the mortgage between the date of commencement and the date of trial was $38,000.00. Plaintiff explained that these funds originated from his Bank of America checking account from his income that he deposited into that account during the pendency of this action. Plaintiff explained that the parties' home was purchased due to a focus on the Children and education, a smaller environment, and then job opportunity and growth. Plaintiff testified that the home represents a significant amount of his net worth and is his largest asset. He Plaintiff further testified that he sought to explore capital improvements on the home to improve its value. Plaintiff stated that he intends to sell the house in the future.
Plaintiff explained that his health had not been good for the past two years. He has brain issues, heart issues, orthopedic issues, neuropathy issues, and other related issues. Plaintiff takes several medications, and these health conditions have resulted in his slowing down at work. Plaintiff has a 90-minute commute to New York City two to three days per week, and on the other days, he commutes to White Plains. Plaintiff stated his income is approximately $371,000.00, consistent with prior years which have included raises of one to three percent. Plaintiff testified that he does not have the possibility of advancement due to his lack of technical knowledge.
According to Plaintiff, none of the Children are disabled, as each have a physical and [*11]mental health which are normal for their age. Plaintiff testified that E.D. has ADHD and is a high school senior, applying to colleges and has a grade point average of 84. According to Plaintiff, E.D. did not have any issues that required Defendant to be home that would have interfered with employment. Plaintiff testified that Defendant received income from her employment at Fun Fit.
Cross Examination -
In approximately November 2022, Plaintiff discovered a brain aneurysm. He has had five heart catheterizations and he had stents placed in two locations of his heart. Plaintiff worked throughout, taking paid time off when he needed. Plaintiff's employment includes a discretionary bonus, and he has received one in the last two calendar years in the range of $20-25,000.00 dollars which he received in December or January.
When questioned about his W-2s for the years 2017 to 2022 (Defendant's Exhibit B), Plaintiff testified that his 2022 W-2 reflected Medicare wages of $369,855.72; his 2021 W-2 reflected Medicare wages of $370,408.16; and his 2020 W-2 reflected Medicare wages of $370,936.22. Plaintiff testified that his 2019 Medicare wages were $435,115.88, as he received two bonuses that year for the years 2018 and 2019. Plaintiff is a W-2 wage earner so all his income should be reflected on the W-2s. When presented with Defendant's Exhibit C, Plaintiff testified that he earns approximately $15,600.00 per month in income.
The parties were married in Maryland. They resided in Maryland after their marriage, and Plaintiff worked at Jacobs Engineering from 2000 to 2017 prior to his employment at STV. He initially commuted from Maryland to New York, while Defendant remained with the Children in Maryland and Plaintiff would return on the weekends. Plaintiff explained that Defendant located the parties' Briarcliff home, and they purchased it in October 2019 for $1,580,000.00, with an approximate original mortgage of $810,000.00. Plaintiff testified that the parties' son has left the home. Plaintiff acknowledged that Defendant will leave the home, and he has not spoken to the other Children about whether they will remain in the home. Plaintiff intends to remain in the house; that the approximate yearly real estate taxes are $48,000.00; and that the approximate monthly mortgage payment is $3,704.77.
Plaintiff testified that the last time he investigated housing options for Defendant and the Children was during mediation prior to the trial. According to Plaintiff, Defendant rejected the option of nesting, and he recommended different affordable areas in the vicinity of the parties' home which had rental properties available. Plaintiff testified that the parties' Children should benefit from some level of parity in terms of housing between Plaintiff's home and Defendant's future home. Plaintiff was looking for stability, continuity, and some type of normalcy as the family proceeds to the next step. Plaintiff noted there was one rental property approximately 10 minutes from the parties' home with an approximate monthly rent of $4,000.00 and included two-bedrooms, two baths, and a loft.
Plaintiff testified that his expenses stated in his Statement of Net Worth are approximately $360,000.00, almost fully exhausting his yearly income of approximately $370,000.00, which comport with his prepared budgets. Plaintiff believed Defendant did not contribute to these expenses as they were paid out of his Bank of America checking account [*12]where he deposits his income. Plaintiff then testified to incidents involving the parties' Children, including disagreements over the use of a vehicle and parties at the marital home. 
Re-Direct Examination —
Plaintiff explained that when considering his testimony pertaining to the incidents regarding the parties' Children, his prior testimony did not change with respect to Defendant not being home to specifically address the behavioral issues of the parties' Children. Plaintiff testified that in two of the three incidents, Defendant either chose not to be home, or was home and left. Plaintiff lives within his means, and he makes tradeoffs in terms of being in a nice house versus driving a nice car. Plaintiff pays most of the parties' expenses and that once this case is concluded, he does not expect to pay those expenses. Plaintiff testified that a total of $1.1 million will be provided to Defendant pursuant to the settlements reached in this case, including approximately $426,000.00 of retirement assets and approximately $600,000.00 in cash. Plaintiff expects E.D. to leave to attend college in the summer of 2024, so if Defendant lived with E.D. and L.D. once this action has completed, it would be only for a few months.
Re-Cross Examination —
Plaintiff testified that the parties originally agreed that the Children would remain in the marital home, but Defendant then changed her position.
c. Testimony of Defendant A.D.
Direct Examination -
Defendant testified that the parties were on vacation when she expressed her dissatisfaction with her life in New York and they should get divorced. Plaintiff returned to New York and Defendant remained on vacation with the parties' two children for two additional weeks. When Defendant returned to New York, she asked to postpone the divorce until after the Children graduated but was told by Plaintiff that he had already filed this action.
Defendant testified that she assisted in the house hunting in New York, and the parties agreed to make an offer on the marital home which was then listed for approximately $1.6 million. Defendant testified that while the parties' budget was $1.1 million, Plaintiff negotiated a purchase price of approximately $1.5 million, but did not inform Defendant. Defendant only learned about the purchase at their goodbye party when they left their prior residence. Defendant testified she would not have purchased the home for $1,538,000.00. Defendant stated she would like to remain in Westchester County until her Children are not located in Westchester County. Defendant testified that she spoke with their daughters, and Defendant's expectation is that L.D. will continue to reside with her, while E.D. will likely go back and forth until she leaves for college.
Defendant testified that E.D. is on Adderall, and when she attended school in Maryland, she did well without any behavioral issues. Her IEP requires teachers to read her all her tests. Defendant testified that upon entering the New York schools, E.D. was placed in special education classes and repeated 8th grade. Defendant does not believe E.D. will complete a four-[*13]year college, leaving on her own will or because her GPA is not high enough.
Defendant explained that when she met Plaintiff, she was working full-time. She stopped working full-time a few weeks prior to the birth of Z.D., who has just turned 25 years old. That was the last time she worked full-time. Defendant is 56 years old. She earned a bachelor's degree from the University of Maryland in journalism approximately 31 years ago, but she never worked in journalism. Defendant currently works at Water Stone, a senior living facility, and she began this employment in July 2022. She is paid hourly. She initially worked 22 hours per week, which increased to approximately 32 to 33 hours per week in February 2023, and that is considered full-time. Defendant testified that overtime was available to her between February and August 2023, but there are no overtime opportunities now.
Defendant loves her job, but she is seeking alternative employment, having participated in interviews during the last six months. Defendant interviewed at Atria on the Hudson in Ossining for the Director of Engaged Life/Activities but was not offered the position. Defendant testified that she believes she was not offered the position due to a lack of experience. She has applied for six to seven Director of Activities positions. Defendant testified that she interviewed at The Bristal in White Plains, and the Executive Director informed her she was not experienced enough for the position she applied for but offered her a lower position which she declined as she would only leave her current position for a higher position. Defendant testified that she initially wanted to work part-time to be home when the Children returned from school to assist with their homework and because her older child "can't really be trusted," so Defendant had sought a part-time job where she would work two days during the week and one weekend day when Plaintiff would be home.
Other than the funds she will receive from the resolution of this matter, Defendant has jewelry, including an engagement ring, wedding ring, diamond earnings, and diamond bracelet. Plaintiff has paid for Defendant's expenses since moving to New York, and while Plaintiff never imposed spending limits upon her, Defendant does not spend much money. Defendant testified to her Statement of Net Worth (Defendant's Exhibit 20), noting that all expenses marked "H" were historically paid by Plaintiff. Defendant's net weekly income ranges between $540.00 and $560.00.
When Defendant shops, she utilizes a charge card for larger purchases and cash for smaller purchases under $40.00. She rarely dines out, and while she shops at Kohl's for herself and her younger daughter, her older daughter does her own shopping. Defendant testified that her daughter's friends have 10 pairs of Lululemons; her daughters wanted to buy six pairs, but Defendant bought them one pair for Christmas. Defendant feels that they can purchase others with their own money if they choose to. Defendant testified that her currently monthly expenses are $5,360.00 without listing any housing expenses. Defendant was aware of the apartment Plaintiff testified to with a monthly rent of $4,000.00, and that it would be a suitable place to live if she could afford it, but she cannot.
When presented with Defendant's Exhibit L, Defendant testified that this accurately reflects her job search for the period of March 2020 through July 2022. Defendant cannot spend the money she receives from this divorce action on housing because she will need it to live on for the rest of her life. Defendant testified that once her younger daughter leaves for college, [*14]Defendant will likely relocate to Boston to reduce her living expenses.
Cross-Examination —
Defendant testified that from the funds she receives in the resolution of this action she plans to buy a car and then place the rest into a CD and accept an annual income of $30,000.00 from that investment. Defendant can earn $60,000.00 per year in a year. Defendant is taking a cyber security course online and will be taking another online certification class. Defendant testified that she does not have managerial experience beyond supervising teenagers, which is why she has been unable to secure a Director of Activities position.
Defendant is computer literate, has a nice speaking voice, could answer a telephone, and sit behind an administrative assistant desk, but she likes working with seniors. Defendant is focused on trying to advance in her current position. Defendant stated she could find full-time employment if she wanted to work as a server, waiter, hostess, or bartender, but that is not the kind of position she is seeking. Defendant testified that she was unable to find any full-time office related job. She was hired by Amazon and was in training for two weeks, but the position was cancelled due to the COVID pandemic. Defendant applied for work as a contact tracer and substitute teacher but was never offered a position. Defendant believes she could make $50,000.00 a year in a job she does not want, but she stated that she has not explored any positions other than where she wants to advance in her career.
Defendant testified that her daughter E.D. has not been sent home from school for sickness or behavioral issues. E.D. has a grade point average between 82 and 84, and L.D. has a grade point average of approximately 94 and is involved in extra-curricular activities, including sports and student government.
Closing Statements
The Court permitted counsel to provide closing statements in the form of post-trial submissions limited to 25 pages in length.
a. Plaintiff's Post-Trial Submission —
Plaintiff asserts that it is undisputed that the parties lived a modest lifestyle. Plaintiff argues that the most important takeaway from trial was Defendant's acknowledgement that if she moved into an apartment that Plaintiff had identified for her which she found agreeable, she could meet her, and the Children's, expenses from her current part-time income and the interest income she had calculated she would receive from her equitable distribution award with the additional combined maintenance and child support award of $4,635.00 per month.
Plaintiff asserts that it is stipulated, or undisputed, that Plaintiff earns $371,000.00 per year. Defendant's annualized income is $50,630.00. Based upon prior stipulations, Defendant will receive an equitable distribution award of more than $1,220,000.00 consisting of cash or cash equivalents of $820,000.00 and $400,000.00 in retirement accounts; and Defendant will earn almost $35,000.00 per year from her non-retirement assets.
With respect to spousal maintenance, Plaintiff asserts that Defendant's paystub for the period ending September 2, 2023, indicates total year-to-date earnings of $36,530.00, leading to [*15]Defendant earning $55,000.00 by the end of 2023. Plaintiff asserts that while Defendant's claim that no additional overtime was not proven, if this was correct, Defendant's year-end earnings would be $50,630.00 based upon the $27,061.00 regular pay for two-thirds of the year, expanded by twelve months, plus the already-earned $8,630.00 in overtime pay.
Plaintiff notes that Richard Turner, Ph.D. was recognized by this Court as an expert in the field of vocational analysis and testified as to his vocational report issued on February 13, 2023. Dr. Turner provided comprehensive testimony regarding Defendant's skills, job experience, and the relevant job market, and opined upon Defendant's ability to obtain a job within six months with an annual income of $60,000.00 to $65,000.00. Plaintiff asserts that Defendant's claims that she is unable to work full-time due to the Children's needs are unavailing, and this Court should impute an income to Defendant in the amount of $65,000.00 for support purposes.
Plaintiff argues that when determining Defendant's spousal maintenance award, the Court should consider the substantial financial resources at Defendant's disposal after the conclusion of this action, including the equitable distribution of marital property and the income or imputed income on the assets to distributed pursuant to DRL § B(6)(e)(1)(m). Plaintiff again notes that pursuant to the terms of the parties' agreements, Defendant will receive equitable distribution totaling $821,092.00 in non-retirement assets and approximately $400,000.00 in retirement assets. Plaintiff argues that at a rate of 4.26%, Defendant will earn $34,932.00 per year on her cash assets, which will supplement her employment income.
Plaintiff asserts that while the parties lived in a large home, it was sparsely furnished. According to Plaintiff, the parties lived a modest lifestyle, including occasionally dining out, shopping at department stores for clothing, completing house cleaning and landscaping without outside assistance, and engaging in modest vacations. Plaintiff states that Defendant's monthly expenses stated on her statement of net worth of $5,360.00 would be reduced to $4,635.00 pursuant to her testimony.
Plaintiff proposes a monthly spousal support obligation of $2,133.00, payable to Defendant for 120 months, based on a cap of combined income of $203,000.00, subject to Plaintiff's credit of $1,500.00 per month commencing on November 1, 2023, for rent for Defendant remaining in a portion of the marital domicile. Plaintiff assets that this proposed 10-year period is approximately 39% of the duration of the parties' marriage, but that this matter has been pending since July 2021 and there have been considerable delays due to Defendant. Further, Plaintiff asserts Defendant has received over two years' support from Plaintiff who has paid housing expenses, health insurance, automobile insurance, and all the Children's expenses. Finally, Plaintiff asserts he has health issues.
Plaintiff maintains that the Court should utilize a combined parental income cap of $163,000.00, applying Plaintiff's and Defendant's earned and imputed incomes for the assignment of pro rata shares. Plaintiff asserts that utilizing this cap and Plaintiff's income of $369,855.00, and an imputed income to Defendant of $65,000.00, basic child support to be paid by Plaintiff to Defendant should be $2,692.00 plus 80% of agreed upon add-on expenses, to reduce to $1,831.00 per months following E.D.'s 21st birthday, and to terminate on L.D.'s 21st birthday. Plaintiff further asserts that Plaintiff should receive a dollar-for-dollar credit for the [*16]Children's room and board expenses while they attend residential college or boarding school. Plaintiff proposes that he will maintain the current, or comparable, health insurance for E.D. and L.D. until each child's 21st birthday, and the parties should be required to provide their pro rata contribution for unreimbursed health care expenses and the incremental cost of Plaintiff's family coverage with Plaintiff contributing 80% and Defendant contributing 20%.
Plaintiff requests this Court direct that neither party relocate with the parties' minor Children which would prevent their attendance at Briarcliff High School, until L.D. graduates therefrom. Plaintiff asserts that such an order is warranted due to Plaintiff's testimony that the purposes of the family's move to the marital domicile was to ensure a quality education for the Children and his desire to remain in the home until the graduation of L.D. to provide stability for L.D.
Plaintiff asserts he is entitled to a credit for the pay down of the principal mortgage balance completed during the pendency of this action. According to Plaintiff, his testimony and the trial evidence provides that the mortgage principal balance as of July 1, 2021, was $810,309.50; the mortgage principal balance as of August 10, 2023, was $771,906.33; providing a principal paydown amount of $38,403.17. Plaintiff requests that this Court award him a credit in the sum of $19,201.00 towards his equitable distribution.
b. Defendant's Post-Trial Submission -
Defendant asserts that following the commencement of this action on July 23, 2021, the parties did not appear for a preliminary conference until February 18, 2022, wherein the parties agreed that Plaintiff shall continue to maintain the financial status quo by funding with his salary the joint marital account at Bank of America (xx2559) to pay 100% of the reasonable and agreed upon marital expenses, e.g., mortgage, real estate taxes, insurance, maintenance, utilities, etc., as well as Defendant's reasonable and customary credit card charges for marital expenses and those of the children. Defendant asserts that due to this agreement, Defendant made no pendente lite application and no further pendente lite award was made by the Court. Therefore, Defendant asserts, Plaintiff's claim for a credit equating to half of the mortgage principal paydown should be denied.
With respect to the calculation of spousal support, Defendant asserts that this Court should utilize Plaintiff's income of $369,355.75 and Defendant's imputed income of $45,000.00, and an income cap of $350,000.00. According to Defendant, this would result in a spousal support award of $5,018.61 per month payable to Defendant by Plaintiff. Defendant asserts that during the period of maintenance, the parties' respective pro rata shares of add-on expenses is 75% Plaintiff and 25% Defendant but considering the statutory factors and disparity in the parties' respective incomes, Plaintiff should be responsible for 90% and Defendant should be responsible for 10%.
Defendant notes that pursuant to the advisory schedule included in the New York State Domestic Relations Law, the duration of spousal support would be between 9 years (35% of the length of the marriage) and 12 years and 11 months (50% of the length of the marriage), as the parties were married for 25 years and 9 months prior to the commencement of this action. [*17]Defendant asserts that this Court should consider Defendant's limited present and future earning capacity based upon her extended absence from the workforce during the marriage and the fact that the parties agreed, during the marriage, that Defendant would devote herself to childcare and homemaking rather than pursuing a career. Defendant requests that this Court require a spousal support duration of not less than 11 years.
Given Plaintiff's repeated concession that his entire income was needed to support the family, Defendant asserts that child support should be calculated using $350,000.00 in combined parental income. Further, this would include Plaintiff's income of $360,355.72 and Defendant's imputed income of $45,000.00 resulting in a basic child support of $5,446.22.
Findings of Fact & Conclusions of Law
a. Imputation of Income
Trial Courts are permitted to impute income of a party when determining a party's income for child support purposes:
A court need not rely upon a party's own account of his or her finances, but may impute income based upon the party's past income or demonstrated future potential earnings (see Brown v. Brown, 239 AD2d 535, 657 N.Y.S.2d 764). The court may impute income to a party based on his or her employment history, future earning capacity, educational background, or money received from friends and relatives (see Matter of LoCasto v. Chiofolo, 89 AD3d 847, 848, 932 N.Y.S.2d 365; Matter of Collins v. Collins, 241 AD2d 725, 727, 659 N.Y.S.2d 955). A Support Magistrate may properly impute income in calculating a support obligation where he or she finds that a party's account of his or her finances is not credible or is suspect (see Matter of Sena v. Sena, 65 AD3d 1244, 1244-1245, 885 N.Y.S.2d 738; Matter of Barnett v. Ruotolo, 49 AD3d 640, 854 N.Y.S.2d 155).
(Rohme v Burns, 92 AD3d 946, 947 [2d Dept 2012]; Brown v Brown, 239 AD2d 535 [2d Dept 1997] ["Here, the court properly imputed an income of $100,000 to the husband, a financial consultant, based on his own testimony that in the three years preceding the commencement of this action, he earned $107,000, $143,000, and $146,000, respectively. . ."]).
In this matter, Defendant testified that she is currently employed on a part-time basis as an Activities Coordinator having earned $36,530.00 in regular and overtime wages through September 2, 2023. Defendant asserts that she has been unable to obtain a position in this field at a higher rate of pay, as an Activities Director or otherwise, and she would like to remain in her current field. Defendant further testified that she has not sought full-time employment in another field of employment, but that she would be able to obtain a full-time position in another field earning $50,000.00 per year.
Dr. Richard Turner testified that Defendant could obtain a position as an Activities Director or Administrative Assistant earning an annual income significantly higher than what Defendant is receiving in her current employment. 
Having observed the witnesses and listened to their respective testimony, the Court find Defendant's testimony to be highly credible. Conversely and as summarized herein, the Court was not compelled by Dr. Turner's testimony (see K.J. v M.J., 14 Misc 3d 1235[A], *3 [Sup Ct, Westchester County 2007], citing Ferraro v Ferraro, 257 AD2d 596, 598 [2d Dept 1999] [In a bench trial, evaluating witnesses' credibility and determining which of the proffered evidence was most credible lies in the sound discretion of the trial court]). Accordingly, based upon the evidence and testimony presented at trial, as well as the applicable law cited herein, the Court determines that for purposes of calculating child support and spousal support, Defendant's imputed income is $50,000.00.
b. Spousal Support
The Appellate Division, Second Department has provided guidance as to the manner in which trial Courts are to calculate spousal maintenance in matrimonial actions:
"'[T]he amount and duration of maintenance is a matter committed to the sound discretion of the trial court, and every case must be determined on its own unique facts'" (Giokas v. Giokas, 73 AD3d 688, 688, 900 N.Y.S.2d 370, quoting Wortman v. Wortman, 11 AD3d 604, 606, 783 N.Y.S.2d 631). The factors to be considered in a maintenance award are, among others, the standard of living of the parties, the income and property of the parties, the distribution of property, the duration of the marriage, the health of the parties, the present and future earning capacity of the parties, the ability of the party seeking maintenance to be self-supporting, the reduced or lost earning capacity of the party seeking maintenance, and the presence of children of the marriage in the respective homes of the parties (see Domestic Relations Law § 236[B][6][a]; Meccariello v. Meccariello, 46 AD3d 640, 641-642, 847 N.Y.S.2d 618; Griggs v. Griggs, 44 AD3d 710, 711—712, 844 N.Y.S.2d 351). "The overriding purpose of a maintenance award is to give the spouse economic independence, and it should be awarded for a duration that would provide the recipient with enough time to become self-supporting" (Sirgant v. Sirgant, 43 AD3d 1034, 1035, 842 N.Y.S.2d 483; see Scarlett v. Scarlett, 35 AD3d 710, 711, 830 N.Y.S.2d 156). Here, considering the relevant factors, the amount and duration of the award of maintenance was a provident exercise of discretion."
(Gordon v Gordon, 113 AD3d 654, 654-655 [2d Dept 2014]).
Pursuant to New York State Domestic Relations Law § 236(B)(6)(a), the Court should consider the following statutory factors when forming the basis for awarding support over and above the income cap of $203,000.00 for spousal support purposes and $163,000.00 for child support purposes:
(a) the age and health of the parties;
(b) the present or future earning capacity of the parties, including a history of limited participation in the workforce;
(c) the need of one party to incur education or training expenses;
(d) the termination of a child support award before the termination of the maintenance award when the calculation of maintenance was based upon child support being awarded which resulted in a maintenance award lower than it would have been had child support not been awarded;
(e) the wasteful dissipation of marital property, including transfers or encumbrances made in contemplation of a matrimonial action without fair consideration;
(f) the existence and duration of a pre-marital joint household or a pre-divorce separate household;
(g) acts by one party against another that have inhibited or continue to inhibit a party's earning capacity or ability to obtain meaningful employment. Such acts include but are not limited to acts of domestic violence as provided in section four hundred fifty-nine-a of the social services law;
(h) the availability and cost of medical insurance for the parties;
(i) the care of children or stepchildren, disabled adult children or stepchildren, elderly parents or in-laws provided during the marriage that inhibits a party's earning capacity;
(j) the tax consequences to each party;
(k) the standard of living of the parties established during the marriage;
(l) the reduced or lost earning capacity of the payee as a result of having forgone or delayed education, training, employment or career opportunities during the marriage;
(m) the equitable distribution of marital property and the income or imputed income on the assets so distributed;
(n) the contributions and services of the payee as a spouse, parent, wage earner and homemaker and to the career or career potential of the other party; and
(o) any other factor which the court shall expressly find to be just and proper.
New York State Domestic Relations Law § 236(B)(6)(f) provides instruction as to the way the duration of post-divorce spousal maintenance is to be determined:
(1) The court may determine the duration of post-divorce maintenance in accordance with the following advisory schedule:

Length of the marriage 

Percent of the length of the marriage for which maintenance will be payable

0 up to and including 15 years 

15%30%

[*18]More than 15 up to and including 20 years 

30%40%

More than 20 years 

35%50%

(2) In determining the duration of post-divorce maintenance, whether or not the court utilizes the advisory schedule, it shall consider the factors listed in subparagraph one of paragraph e of this subdivision and shall set forth, in a written decision or on the record, the factors it considered. Such decision shall not be waived by either party or counsel. Nothing herein shall prevent the court from awarding non-durational maintenance in an appropriate case.
(3) Notwithstanding the provisions of subparagraph one of this paragraph, post-divorce maintenance shall terminate upon the death of either party or upon the payee's valid or invalid marriage, or upon modification pursuant to paragraph b of subdivision nine of this part or section two hundred forty-eight of this article.
(4) Notwithstanding the provisions of subparagraph one of this paragraph, when determining duration of post-divorce maintenance, the court shall take into consideration anticipated retirement assets, benefits, and retirement eligibility age of both parties if ascertainable at the time of decision. If not ascertainable at the time of decision, the actual full or partial retirement of the payor with substantial diminution of income shall be a basis for a modification of the award.
In this matter, the Court has reviewed the following statutory factors pursuant to New York State Domestic Relations Law § 236(B)(6)(a), as the basis noted below for awarding support over and above the income cap of $203,000.00 for spousal support purposes and $163,000.00 for child support purposes:
(a) The age and health of the parties
Plaintiff is 60 years old. He testified that he has health concerns, but he has presented no evidence at trial that his health impeded his employment, or he expects being incapable of continuing his salaried employment. Defendant is 56 years old and did not testify or present any evidence as to her medical condition.
(b) The present or future earning capacity of the parties, including a history of limited participation in the workforce
Plaintiff was effectively the sole wage earner during the parties' marriage, supporting the parties' lifestyle with his income. Plaintiff's average income for the period 2017 to 2021, pursuant to his Social Security Statement, dated August 19, 2022 and his 2022 W-2, was approximately $369,420.20 (2017 - $308,407; 2018 - $343,235; 2019 - $454,115; 2020 - $370,936; 2021 - $370,408; 2022 - $369,855.72). Defendant earned negligible income during the marriage, as she acted as the primary caregiver to the parties' three Children. Defendant's Social Security Statement, dated December 5, 2022, reflects Defendant's [*19]average income for the period 2017 to 2020 as $1,741.25 (2017 - $0; 2018 - $5,285; 2019 - $1,007; 2020 - $673). Defendant's 2022 W-2 reflects income of $12,553.17. At trial, Defendant acknowledged her ability to earn $50,000.00 per year, and in 2023, she had earned $36,530.00 in regular and overtime wages through September 2, 2023.
(c) The need of one party to incur education or training expenses
Plaintiff has no need for additional education or training. Defendant may require additional education and training to the extent she wishes to obtain income over the $50,000.00 annual income amount she testified she is currently able to obtain.
(d) The termination of a child support award before the termination of the maintenance award when the calculation of maintenance was based upon child support being awarded which resulted in a maintenance award lower than it would have been had child support not been awarded
Not Applicable.
(e) The wasteful dissipation of marital property, including transfers or encumbrances made in contemplation of a matrimonial action without fair consideration
Not Applicable.
(f) The existence and duration of a pre-marital joint household or a pre-divorce separate household
Not Applicable.
(g) Acts by one party against another that have inhibited or continue to inhibit a party's earning capacity or ability to obtain meaningful employment. Such acts include but are not limited to acts of domestic violence as provided in section four hundred fifty-nine-a of the social services law
Not Applicable.
(h) The availability and cost of medical insurance for the parties
Defendant and Children have been covered by Plaintiff's health insurance through employment during the parties' marriage. Upon entry of a Judgment of Divorce, Defendant will be required to secure health insurance through COBRA, private insurance, or through her current employer to the extent it is available.
(i) The care of children or stepchildren, disabled adult children or stepchildren, elderly parents or in-laws provided during the marriage that inhibits a party's earning capacity
As Defendant was the primary caregiver for the parties' three Children during the marriage, Defendant has inhibited earning capacity as she focused on raising her Children rather than focusing on her career.
(j) The tax consequences to each party
Not Applicable
(k) The standard of living of the parties established during the marriage
Plaintiff testified that his entire earned income was necessary to satisfy the parties' lifestyle established during the marriage in a 5,500 square foot home purchased for over $1.5 million dollars in Briarcliff Manor, New York.
(l) The reduced or lost earning capacity of the payee as a result of having forgone or delayed education, training, employment or career opportunities during the marriage
Defendant's role as primary caregiver for the parties' three Children prevented her from entering the workforce until after this action was commenced. Defendant's current and foreseeable income is a fraction of Plaintiff's income.
(m) The equitable distribution of marital property and the income or imputed income on the assets so distributed
Defendant will receive an equitable distribution award of more than $1,220,000.00, consisting of cash or cash equivalents of $820,000.00 and $400,000.00 in retirement accounts. Defendant will likely earn almost $35,000.00 per year on her non-retirement assets, even if those assets are placed in a conservative investment such as a cash deposit.
(n) The contributions and services of the payee as a spouse, parent, wage earner and homemaker and to the career or career potential of the other party
Defendant contributed to Plaintiff's career potential and earning capacity by acting as primary caregiver to the parties' Children while Plaintiff was free to form business relationships, further his career goals and solidify his earning capacity.
(o) Any other factor which the court shall expressly find to be just and proper
Not Applicable
Where the payor's income exceeds the income cap, the Court must first determine the amount of support under the guidelines up to and including the income cap, which is currently $203,000.00 for the payor spouse. For Plaintiff, the income up to the cap utilized below is $203,000.00 less FICA ($9,932.40) and Medicare ($2,943.50), or $190,124.10. For Defendant, utilizing her imputed income of $50,000.00 less FICA ($3,100.00) and Medicare ($725.00), her net income is $46,175.00. Child support is an issue in this case because two of the children are unemancipated (Domestic Relations Law § 236B[c][2]), so the calculations are as follows:
Guideline Calculations
Calculation One
20% Maintenance Payor's Income minus 25% of Maintenance Payee's Income
$190,124.10 x 20% = $38,024.82
$ 46,175.00 x 25% = $ 11,543.75
Result 1: $26,481.07
Calculation Two
30% Maintenance Payor's Income minus 20% of Maintenance Payee's Income
$190,124.10 x 30% = $57,037.23
$46,175.00 x 20% = $ 9,235.00
Result 2: $47,802.23
Calculation Three
40% of Combined Income minus Payee's Income
$236,299.10 x 40% = $94,519.64
Minus $46,175.00 = $48,344.64
The lesser of Result 1 and Result 3 is $26,481.07, which constitutes the annual guideline amount for post-judgment spousal support up to the cap, or $2,207.00 (rounded) per month. However, based upon the evidence and testimony presented at trial, as well as the applicable law cited herein, the Court determines that for purposes of calculating spousal support the Court will utilize an income cap of $350,000.00 in combined income, and a durational component of 12 years.
Thus, utilizing a salary for Plaintiff of $300,000.00 ($350,000.00 minus $50,000.00) less FICA ($9,932.40) and Medicare ($4,350.00), Plaintiff's net salary is $285,717.60. For Defendant, utilizing her imputed income of $50,000.00 less FICA ($3,100.00) and Medicare ($725.00), her net income is $46,175.00. 
Calculation One
20% Maintenance Payor's Income minus 25% of Maintenance Payee's Income
$285,717.60 x 20% = $ 57,143.52
$ 46,175.00 x 25% = $ 11,543.75
Result 1: $ 45,599.77
Calculation Two
30% Maintenance Payor's Income minus 20% of Maintenance Payee's Income
$285,717.60 x 30% = $ 85,715.28
$46,175.00 x 20% = $ 9,235.00
Result 2: $ 76,480.28
Calculation Three
40% of Combined Income minus Payee's Income
$331,892.60 x 40% = $132,757.04
Minus $46,175.00 = $ 86,582.04
The lesser of Result 1 and Result 3 is $45,599.77, which constitutes the annual amount for post-judgment spousal, or $3,800.00 (rounded) per month. 
As stated above, upon review of the enumerated factors (Domestic Relations Law § 236[B][6][a]), the Court finds the reasonable, appropriate, and fair amount of maintenance to be awarded to Defendant and paid by Plaintiff is $3,800.00 per month for 144 months (12 years), unless sooner terminated by death, re-marriage, or the provisions of DRL § 248. The award shall be paid on the 15th of each month, commencing on February 15, 2024. 
c. Child Support
In calculating the basic child support obligation, the Appellate Division, Second Department has noted:
The Child Support Standards Act "'sets forth a formula for calculating child support by applying a designated statutory percentage, based upon the number of children to be supported, to combined parental income up to a particular ceiling'" (Matter of Peddycoart v. MacKay, 145 AD3d 1081, 1083, 45 N.Y.S.3d 135, quoting Matter of Freeman v. Freeman, 71 AD3d 1143, 1144, 898 N.Y.S.2d 65). "Where ... the combined parental income exceeds the statutory cap, in fixing the basic child support obligation on income over the cap, the court has the discretion to apply the factors set forth in Family Court Act § 413(1)(f), or to apply the statutory percentages, or to apply both" (Matter of Good v. Ricardo, 189 AD3d 830, 831, 136 N.Y.S.3d 472, citing Family Ct Act § 413[1][c][3]; see Matter of Giraldo v. Fernandez, 199 AD3d 796, 798—799, 158 N.Y.S.3d 149; Matter of Calta v. Hoagland, 167 AD3d 598, 89 N.Y.S.3d 247). "However, the Family Court must articulate an explanation of the basis for its calculation of child support based on parental income in excess of the statutory cap" (Matter of Peddycoart v. MacKay, 145 AD3d at 1084, 45 N.Y.S.3d 135; see Matter of Keith v. Lawrence, 113 AD3d 615, 616, 978 N.Y.S.2d 316). "This articulation should reflect 'a careful consideration of the stated basis for its exercise of discretion, the parties' circumstances, and its reasoning why there [should or] should not be a departure from the prescribed percentage' " (Matter of Peddycoart v. MacKay, 145 AD3d at 1084, 45 N.Y.S.3d 135, quoting McCoy v. McCoy, 107 AD3d 857, 858, 967 N.Y.S.2d 137; see Matter of Good v. Ricardo, 189 AD3d at 831—832, 136 N.Y.S.3d 472).
(Butta v Realbuto, 214 AD3d 973, 974-975 [2d Dept 2023]).
New York State Domestic Relations Law § 240(1-b) provides as follows:
(a) The court shall make its award for child support pursuant to the provisions of this subdivision. The court may vary from the amount of the basic child support obligation determined pursuant to paragraph (c) of this subdivision only in accordance with paragraph (f) of this subdivision.
* * *
(f) The court shall calculate the basic child support obligation, and the non-custodial parent's pro rata share of the basic child support obligation. Unless the court finds that the non-custodial parents's [sic] pro-rata share of the basic child support obligation is unjust or inappropriate, which finding shall be based upon consideration of the following factors:
(1) The financial resources of the custodial and non-custodial parent, and those of the child;
(2) The physical and emotional health of the child and his/her special needs and aptitudes;
(3) The standard of living the child would have enjoyed had the marriage or household not been dissolved;
(4) The tax consequences to the parties;
(5) The non-monetary contributions that the parents will make toward the care and well-being of the child;
(6) The educational needs of either parent;
(7) A determination that the gross income of one parent is substantially less than the other parent's gross income;
(8) The needs of the children of the non-custodial parent for whom the non-custodial parent is providing support who are not subject to the instant action and whose support has not been deducted from income pursuant to subclause (D) of clause (vii) of subparagraph five of paragraph (b) of this subdivision, and the financial resources of any person obligated to support such children, provided, however, that this factor may apply only if the resources available to support such children are less than the resources available to support the children who are subject to the instant action;
(9) Provided that the child is not on public assistance (i) extraordinary expenses incurred by the non-custodial parent in exercising visitation, or (ii) expenses incurred by the non-custodial parent in extended visitation provided that the custodial parent's expenses are substantially reduced as a result thereof; and
(10) Any other factors the court determines are relevant in each case, the court shall order the non-custodial parent to pay his or her pro rata share of the basic child support obligation, and may order the non-custodial parent to pay an amount pursuant to paragraph (e) of this subdivision.
The Court notes that these factors, which it utilized in awarding Defendant spousal support, are likewise applicable to the Court's awarding of child support in the amount set forth herein.
Utilizing the statutory cap of $163,000.00 total income for child support purposes, the Court multiplies that figure by 25% for the two unemancipated children, resulting in $40,750.00 per year, or $3,395.83 per month under the guidelines. This figure is insufficient based on the parties' lifestyle and standard of living.
The Court will thus calculate child support on the total income utilized for spousal support purposes (less FICA and Medicare), or $331,892.60 ($240,117.83 [Plaintiff] + $91,774.77 [Defendant]), for the reasons stated herein. Multiplying this figure by 25%, as there are two unemancipated children of the marriage, the child support amount is $82,973.15 per year, or $6,914.43 (rounded) per month. Pro-rated figures based on these two incomes utilized for child support purposes results in proportional shares (rounded) to be 72% Plaintiff and 28% Defendant, or $4,978.40 (rounded) per month payable by Plaintiff, and $1,936.04 per month payable by Defendant. 
This child support obligation shall remain in effect until E.D. is emancipated, at which time the child support award shall be reduced as follows: Multiplying $331,892.60 by 17% for one child, the child support amount will be $56,421.74 per year, or $4,702.00 (rounded) per month. Pro-rated based on the parties' incomes, 72%, or $3,385.44 per month, payable by Plaintiff, and 28%, or $1,316.56 per month, payable by Defendant. 
In addition, the Court directs Plaintiff to secure and maintain a life insurance policy in the amount of $1MM, naming Defendant as the irrevocable beneficiary, and to provide Defendant with the requisite authorizations to access the insurance company to confirm the policy remains in effect. This obligation shall remain in effect as long as Plaintiff is obligated to pay spousal maintenance and child support to Defendant (see Sinnott v Sinnott, 194 AD3d 868, 879 [2d Dept 2021] [courts have the general authority to order a party to purchase and secure a life insurance policy to secure the support obligations]). 
The Court further directs that Plaintiff shall maintain the current or comparable health insurance, dental insurance, and vision insurance for the parties' minor Children E.D. (D.O.B. xx/xx/2005) and L.D. (D.O.B. xx/xx/2007), with the parties being required to pay the family portion of such insurance premiums in the pro rata amount of Plaintiff 72% and Defendant 28%. To effectuate this provision, within ten (10) days of this Decision and Order, Plaintiff shall obtain a letter from his employer indicating the cost of any health, dental and/or vision insurance policies setting forth the cost for Plaintiff alone, and Plaintiff with the Children, the difference being the family portion. Defendant shall provide to Plaintiff her pro rata share of any insurance premiums on or before the first day of each month.
The Court further directs that the parties shall pay the unreimbursed health, medical, dental, orthodontal, vision, hospitalization, and pharmacy costs for the parties' minor Children E.D. (D.O.B. xx/xx/2005) and L.D. (D.O.B. xx/xx/2007), in the pro rata amount of Plaintiff 72% and Defendant 28%.
"Unlike the obligation to provide support for a child's basic needs, 'support for a child's [*20]college education is not mandatory'" (Lynn v Kroenung, 97 AD3d 822, 823 [2d Dept 2012], quoting Cimons v Cimons, 53 AD3d 125, 127 [2d Dept 2008]). "Instead, absent a voluntary agreement, whether a parent is obligated to contribute to a child's college education is 'dependent upon the exercise of the court's discretion in accordance with Domestic Relations Law § 240(1-b)(c)(7)'" (Lynn v Kroenung, 97 AD3d at 823, quoting Cimons v Cimons, 53 AD3d at 127). "[A]nd an award will be made only as justice requires" (Lynn v Kroenung, 97 AD3d at 823 [internal quotation marks and citations omitted]). Here, the Court finds that the parties contemplated sending the Children to college. They specifically moved to the Briarcliff schools in anticipation of that goal and to prepare the Children for higher education. The parties agree that E.D. plans to attend college beginning in August 2024. Thus, the Court finds that "justice requires", and the parties are so directed to pay for the higher education expenses of the parties' minor Children E.D. (D.O.B. xx/xx/2005) and L.D. (D.O.B. xx/xx/2007), up to a four-year degree at any college, university or vocational school, with tuition capped at a SUNY Binghamton rate, including room, board, books, laboratory costs, and application fees, in the pro rata amount of Plaintiff 72% and Defendant 28% (see Rohrs v Rohrs, 297 AD2d 317, 318 [2d Dept 2002]). In addition, Plaintiff shall receive a dollar-for-dollar credit for the Children's room and board expenses while they attend residential college, university, or vocational school (see Kim v Schiller, 112 AD3d 671, 676 [2d Dept 2013]; Keating v Keating, 33 AD3d 867, 868 [2d Dept 2006]).
d. Claimed Credit for Mortgage Paydown
Trial Courts have the discretion to award a credit of half of reduction of the mortgage principal on a marital residence following the commencement of a matrimonial action to the payoff spouse (see Arnold v Arnold, 309 AD2d 1043, 1045 [3d Dept 2003]). The Second Department, Appellate Division has held that where a party enters into a pendente lite stipulation, fails to challenge the validity of the stipulation, and makes voluntary loan payments the party making such payments would not be entitled to a credit for such payments after the conclusion of the trial (see Culen v Culen, 157 AD3d 930, 933-934 [2d Dept 2018]).
In this matter, the parties entered into a Stipulation set forth in Section F of the Preliminary Conference Order, which was signed by the parties and their counsel, and later entered as an Order of this Court. At no time prior to, during, or after trial has Plaintiff challenged this Stipulation. Accordingly, based upon the evidence and testimony presented at trial, as well as the applicable law cited herein, the Court denies Plaintiff's request for a credit of half of the reduction of the mortgage principal on the marital residence following the commencement of the matrimonial action. 
e. Other Relief
Any relief specifically not granted or otherwise addressed herein is denied.
* * *
Based upon the foregoing, it is hereby
ORDERED that that for purposes of calculating child support and spousal support, Defendant's imputed income is $50,000.00; and it is further
ORDERED that for the reasons stated herein, Defendant shall pay Plaintiff spousal support in the amount of $3,800.00 per month for 144 months (12 years), unless sooner terminated by death, re-marriage, or the provisions of DRL § 248. The award shall be paid on the 15th of each month, commencing on February 15, 2024; and it is further
ORDERED that the Court awards Defendant child support from Plaintiff for the parties' minor Children E.D. (D.O.B. xx/xx/2005) and L.D. (D.O.B. xx/xx/2007) in the amount of $4,978.40, payable by Plaintiff directly to Defendant by the 15th of each month commencing on February 15, 2024; and it is further
ORDERED that upon E.D.'s emancipation, Plaintiff shall pay Defendant child support for the parties' minor Child L.D. (D.O.B. xx/xx/2007), in the amount of $3,385.44 per month, payable by Plaintiff directly to Defendant by the 15th of each month, until L.D.'s emancipation; and it is further 
ORDERED that Plaintiff shall maintain the current or comparable health insurance, dental insurance, and vision insurance for the parties' minor Children E.D. (D.O.B. xx/xx/2005) and L.D. (D.O.B. xx/xx/2007), with the parties being required to pay the family portion of such insurance premiums in the pro rata amount of Plaintiff 72% and Defendant 28%. To effectuate this provision, within ten (10) days of this Decision and Order, Plaintiff shall obtain a letter from his employer indicating the cost of any health, dental and/or vision insurance policies setting forth the cost for Plaintiff alone, Plaintiff with Children, the difference being the family portion. Defendant shall provide to Plaintiff her pro rata share of any insurance premiums on or before the first day of each month; and it is further
ORDERED that the parties shall pay the unreimbursed health, medical, dental, orthodontal, vision, hospitalization, and pharmacy costs for the parties' minor Children E.D. (D.O.B. xx/xx/2005) and L.D. (D.O.B. xx/xx/2007), in the pro rata amount of Plaintiff 72% and Defendant 28%; and it is further
ORDERED that the parties shall pay the higher education expenses of the parties' minor Children E.D. (D.O.B. xx/xx/2005) and L.D. (D.O.B. xx/xx/2007), up to a four-year degree at any college, university or vocational school, with tuition capped at a SUNY Binghamton rate, including room, board, books, laboratory costs, and application fees, in the pro rata amount of Plaintiff 72% and Defendant 28%; and it is further
ORDERED that Plaintiff shall receive a dollar-for-dollar credit for the Children's room and board expenses while they attend residential college, university, or vocational school; and it is further
ORDERED that Plaintiff's request for a credit of half of reduction of the mortgage principal on a marital residence following the commencement of a matrimonial action is denied; and it is further
ORDERED that to the extent any relief sought has not been granted it is expressly denied; and it is further
ORDERED that within 30 days of this Decision and Order, Plaintiff's counsel shall [*21]submit a proposed Findings of Fact and Conclusions of Law, Judgment of Divorce, and all other ancillary documents needed for the Court to enter a Judgment of Divorce, either on consent or noticed for settlement.
The foregoing constitutes the Decision and Order of the Court. 
Dated: January 31, 2024
White Plains, New York
ENTER:
Hon. James L. Hyer, J.S.C.